FIFTY-FIRST ANNUAL REPORTS, 1899. 1849

State ex rel. Wilder et als., vs. Board of Liquidation.

No. 13,034.

STATE EX REL MISS L. B. WILDER ET ALS. VS. BOARD OF LIQUIDATION CITY DEBT ET AL.

SYLLABUS.

1. It by no means follows that a Board which owes its existence to statute authority and has its powers and duties defined thereby, should be under a continuing liability to have its future conduct and duties controlled by the same authority. This question has to be determined in each case by the nature and character of the duties cast upon the Board, the rights of third parties which may have resulted from an acceptance of the trust and the duty and liability of the Board itself and its members as resulting from the same fact. The Board of Liquidation of the City Debt and the Drainage Commissioners of the City of New Orleans are legally justified in testing 'the Constitutionality of Articles 315, 316 and 317 of the Constitution of 1898 as impairing the obligation of contracts.

2. The surplus of the one per cent. tax in New Orleans set aside for permanent public improvements by Act 110 of 1890, and the Constitutional amendment of 1892, is the surplus which may remain after applying the tax collected to the satisfaction of the debts and claims therein specially enumerated as those which were to be provided for through the tax.

3. The unpaid salaries for the years 1880, 1881, 1882, 1883 and 1884 of teachers in the public schools in New Orleans under contracts with the City School Board of that city, were not debts of that city, and were not intended to fall under the provisions of the funding law of 1890, and the Constitutional amendment of 1892. They only became obligations of the city by the latter's assumption of them under the Constitutional amendment.

The Constitutional Convention had the power to have those claims paid through the one per cent. tax, but only subordinately to the rights upon the tax in favor of creditors holding contract rights at the date of the adoption of the Constitution.

These rights could not constitutionally be impaired.

ON APPEAL from the Civil District Court for the Parish of Orleans. Rightor, J.

Charles J. Theard. Arthur McGuirk and Henry L. Lazarus for Plaintiffs and Appellees.

Branch K. Miller for Board of Liquidation of the City Debt, Defendant and Appellant.

Howe, Spencer and Cocke for the Drainage Commission of New Orleans, Intervenor and Appellant.

Argued and submitted December 24th, 1898.
Opinion handed down May 1st, 1899.

Judgment amended and rehearing refused June 30th, 1899.

N. B.—This case has been removed to the Supreme Court of the United States by a writ of error.

The opinion of the court was delivered by

NICHOLLS, C. J.　By the 315th Article of the Constitution, the City of New Orleans was authorized and *required* to examine into and assume payment of the obligations of the Board of Directors of the Public Schools of the parish of Orleans, for unpaid salaries of school teachers and portresses and other legitimate claims against said school board for the years 1882, 1883 and 1884, and for unpaid salaries of school teachers and portresses for the years 1885, 1886 and 1887, then (now) in the hands of the original holders, who have, in no wise parted with their rights of ownership, or pledged the same, as *may be found equitably due* by said board.

By the 316th Article, the City Council was directed to issue certificates of indebtedness to the owners of said claims, when examined and found to be equitably due, and all such certificates were directed to be paid by the Board of Liquidation.

The article provided that if any of the claims aforesaid should be rejected by the City Council, the decision thereon might be reviewed by any court of competent jurisdiction, and the judgment of the court thereon, should, if in favor of the claimant, be likewise paid by the Board of Liquidation.

The 317th Article directed that the funds requisite to pay said claims should be provided by the sale of a sufficient number of the Constitutional bonds of the city of New Orleans of the issue provided for by Act No. 110 of the General Assembly for the year 1890, and by the amendment to the Constitution of the State submitted to the people by said act, and adopted at the general election in 1892.

Acting under and by virtue of the provisions of these articles of the Constitution, the City Council of New Orleans examined into and assumed payment of the school teachers and portresses of the public schools of that city for the years 1882, 1883 and 1884, and the city comptroller, by direction of the council, issued certificates of indebtedness countersigned by the mayor, setting forth the amount due by the city to each claimant and representing a total sum of one hundred and fifteen thousand five hundred and fifty-eight dollars and thirty-three cents.

The board of liquidation on presentation of the same for payment refused to pay the same, on the ground that the mode of payment provided by Article 317 of the Constitution, to-wit: by the sale of bonds of the issue provided for by Act No. 110 of 1890 (Constitutional Amendment of 1892), would impair the obligation of contracts and therefore be a violation of the Constitution of the United States.

The holders of the certificates thereupon cited the board of liquidation into the Civil District Court to show cause why a writ of *mandamus* should not issue against them, commanding them to pay the certificates together with legal interest thereon, from judicial demand until paid, and provide the requisite funds by the sale of a sufficient number of said constitutional bonds.

The board of liquidation answered pleading first the general issue. Averring its right and its duty so to do, it resisted plaintiff's demand on assigned grounds and prayed that their demand be rejected.

The drainage commissioners of the city of New Orleans intervened in the case joining the defendants in resisting the demand of the plaintiffs.

The latter excepted to the right of the drainage commission to intervene and its right and authority and that of the board of liquidation to set up the issues tendered.

The District Court dismissed the intervention of the drainage commission and ordered the mandamus prayed for to issue.

The drainage commission and the board of liquidation appealed. In their brief plaintiffs say: "It might well be asked what right the board of liquidation had to assail the validity of the Constitution of Louisiana. Created by Act No. 133 of the Legislature of 1880, the board of liquidation is merely a servant of the people.

"Its members are trusted clerks charged generally with the liquidation of the city debt; that is all. They are not above the law, they are creatures of the law. If it be true that the Act of 1890 or Constitutional Amendment of 1892 confided to them a special trust, it is also true that they received said trust from the sovereign State of Louisiana and that she may well modify the instructions which she had seen fit originally to give. It can not be admitted for a moment that the board of liquidation would have the right in any case to disregard and disobey the mandate of the Constitution and resist and defy the will of the people".

A similar claim was advanced in Board of Public School Directors vs. The City of New Orleans (42 Ann., 96), and held by this court to be not well founded.

We adhere to that conclusion and adopt as correct the reasons assigned by the court for reaching it.

It by no manner of means follows that a board which owes its existence to statute authority and has its powers and duties defined thereby, is necessarily under a continuing liability to have its future conduct and its future duties controlled by the same authority.

There are doubtless cases where this power of control continues absolutely, but there are others where, though it may be continued, it is under limitations; and others again when it ceases altogether.

This question has to be determined in each case by the nature and character of the duties, cast upon the board; the rights of third parties which may have resulted from an acceptance of the trust and the duty and liability of the board itself and its members as resulting from the same fact.

In the case just referred to the court said: "It would be passing strange indeed if after the defendants here have been commanded to show cause why the relief sought against them should not be granted, they could be met, when they appear, in response, with the objection that they have no standing in court." (11th Wall., 267; 17 Ann., 251; 39 Ann., 11.) The court further said it did not hold (in 41 Ann., 156) that the city did not possess the right of *pleading* unconstitutionality and that they must *not be heard*.

Article 254 of the Constitution of 1879, referring to the powers and duties of the Legislature, in respect to the city of New Orleans, said: "The General Assembly at its next session after the adoption of the Constitution shall enact such legislation as may be proper to liquidate the indebtedness of the city of New Orleans and apply its assets to the satisfaction thereof.

"It shall have authority to cancel the charter of said city and remit its inhabitants to another form of government, if necessary."

This article was adopted in view of the very many sweeping alterations made in the Constitution in the powers of taxation, not only of the different parish and municipal corporations of the State, but of the State itself, and in the extent of legislative control over corporations both private and public.

Article 45 prohibited the General Assembly from "granting or au-

thorizing any parish or municipal authority to grant any extra compensation, fee or allowance to a public officer, agent, servant or contractor, or authorize the payment of any claim against the State or any parish or municipality of the State, under any agreement or contract, made without express authority of law, and declared that all such agreements or contracts should be null and void."

By Article 46 the General Assembly was prohibited from passing any local or special law "creating corporations, or amending, renewing, extending, or explaining the charter thereof,(provided this should not apply to the corporation of the city of New Orleans), or from granting to any corporation any special or exclusive right, privilege or immunity, or legalizing the unauthorized or invalid acts of any officer, servant, agent of the State or of any parish or municipality thereof."

Article 202 declared that the taxing power might be exercised by the General Assembly, for State purposes, and by parish and municipal corporations under authority granted to them by the General Assembly for parish and municipal purposes, but Article 209 declared the State tax on property for all purposes whatever, including expenses of government, schools, levees and interest, should not exceed in any one year six mills of the dollar of its assessed value, if the ordinance regarding the bonded debt of the State should be adopted and ratified by the people, and if said ordinance should not be adopted, and ratified by the people, said State tax for all purposes should not exceed, in any one year, five mills on the dollar of the assessed valuation, and no parish or municipal tax for all purposes whatsoever should exceed ten mills on the dollar of valuation. Article 229, however, directed that the General Assembly should provide that every parish might levy a tax for the public schools therein, which should not exceed the State tax, provided that with such tax the whole amount of parish taxes should not exceed the limits of parish taxation, fixed by the Constitution.

In 1880, the General Assembly passed Act No. 133, entitled: "An Act to liquidate the indebtedness of the city of New Orleans and apply its assets to the satisfaction thereof, to create a board of liquidation and prescribe their duties and to provide for a fiscal agent, and for the levying of a special tax to pay said interest".

For the purpose of carrying out the purposes of the Act and liquidating the indebtedness of the city, a board, designated as the board of liquidation of the city debt, was created, to which the duty was

assigned, or delegated, of retiring and cancelling "the entire debt of the city," except the floating debt created up to the date of the passage of the act (April, 1880). The board was authorized and directed to have certain described bonds prepared, which it was declared were to be used exclusively for the purpose of negotiation or of exchange as therein provided for. The method provided for for retiring the debt was either by the sale of the new bonds or by their exchange for old ones. It was provided that the entire issue of new bonds to be sold or exchanged should not exceed ten million of dollars. It was declared that nothing in the Act should be construed as affecting Article No. 31 of 1876, known as the "premium bond act," and it was made the duty of the city authorities to turn over and transfer to the board all monies collected on account of the tax levied in accordance with the provisions of that act, and it was made the duty of the board to apportion the proceeds of said tax, and apportion the same *pro rata,* and in the proportion which each form of bonded indebtedness should bear to the entire amount of the city's debt, and such portions of the said proceeds of tax as should not properly belong to the outstanding amount of premium bonds, were directed to be applied to the payment of the bonds created by the act, then being enacted. The act required the city council to levy an annual tax calculated upon the assessment of the preceding year less twenty *per cent.,* sufficient to pay in full the interest on all the bonds issued under its provisions and it directed that any tax levied should continue in force until superseded by a new tax levy for the same purpose.

The surplus arising from the collection of the debt and interest tax or from the sale of assets in the hands of the board after paying the interest coupons of the bonds to be issued under the act was ordered to be used for the purchase and retirement of any valid bond of the city created before the passage of the act, at a rate not exceeding fifty cents on the dollar, or at the discretion of the board for the retirement of the bonds created under the act at a price not exceeding par, and the bonds or obligations purchased, exchanged or retired were directed to be cancelled. The fourth section of the act subjected the members of the board to a criminal prosecution should they knowingly audit, fund, or purchase or retire for value any illegal obligation of the city or use any portion of the bonds authorized to be issued or the proceeds for purposes otherwise than those contemplated by the act.

In 1882 the General Assembly by Act No. 58 of that year, authorized the city of New Orleans to renew and extend payment of her outstanding bonds other than premium bonds, to provide the rate of interest on the bonds as renewed or extended and to levy a tax to pay the same. This tax the act declared should never exceed one-half of one *per cent.*, nor be less than one-quarter of one *per cent.* on the assessed valuation of all taxable property, and should be turned over as collected to the board of liquidation in the same manner as the premium bond tax, to be by them deposited to the credit of the city debt fund and to be applied exclusively for the objects and purposes therein declared.

The act directed that all funds then or which might be at the date of the passage of the act in the hands of the board of liquidation under existing laws, should be deposited with the fiscal agent of the board to the credit of the account known as the "City Debt Fund," which fund should be used exclusively to the purchase on the most favorable terms not exceeding par of the face value of the outstanding bonds or coupons or certificates therefor of the city, which were extended or to be extended under the provisions of the act, then being enacted, provided, that said city debt fund should be used first to provide for and pay the interest on the bonds and certificates contemplated in the act, and the city was directed in its annual budget to make an appropriation to carry out the provisions of the act.

The seventh section directed that the surplus proceeds of any of the premium bond tax of each year remaining in the hands of the board of liquidation, or surplus on hand at the time of the passage of the act after all the drawn series, interest and premiums thereon exigible or due to the holders thereof have been provided for or fully paid, should also be deposited with the fiscal agent of the board to the credit of the account known as the city debt fund, and applied exclusively as provided in section fifth.

The tenth section declared the act in all its parts, provisions, terms, conditions, obligations and limitations, should be deemed to be and be a valid, binding contract between the State of Louisiana, the city of New Orleans, its residents, citizens and taxpayers, and the holders of the bonds authorized in the act to be extended.

In July, 1884, the General Assembly passed an act known as No. 67 of that session, entitled "An Act to amend and re-enact sections 2, 3

and 5 of an act entitled 'An Act to liquidate the indebtedness of the city of New Orleans and to apply its assets to the satisfaction thereof; to create a board of liquidation and prescribe their duties; and to provide for a fiscal agent and for the levying of a sufficient tax to pay said interest', approved April 10th, 1880; and to further provide for the redemption of the bonds authorized herein, the payment of the interest on the same when said tax is not levied; and for the disposition and sale of said assets and other property."

The act so amended is the act herein before referred to as Act No. 133 of 1880.

The amendment to the second section consisted in extending the powers and duties of the board of liquidation so as to give it exclusive control and direction of not only all matters relating to the "bonded debt" of the city, but of all matters relating to the "judgment and bonded" debt of the city; and in altering the form and terms of the bonds which the board had been directed to have prepared.

The third section of the Act of 1880, *as amended,* authorized and required, and made it the duty of the board to retire and cancel the entire debt of the city standing at the time of the passage of the amending act in the form of *executory judgments,* and registered under the provisions of Act No. 5 of 1870, and that which *thereafter might become merged into executory judgments* and likewise registered, except the floating debt or claims created for and against the year 1879 and subsequent years.

It declared that it was the full intent and meaning of the amending act to apply solely the privileges thereof to executory judgments at that time rendered (the passage of the new act) against the city, and to such floating debt or claims against said city for 1878 and previous years merged and to be merged into executory judgments, whether absolute or rendered against the revenues of any particular year or years previous to the year 1879.

For the purpose of retiring and cancelling said judgment debt the board was authorized and required either to sell the bonds to be issued under the act at not less than their par value and apply the proceeds thereof to the payment of the said judgments as specified, or to issue said bonds in exchange thereof.

*In July,* 1890, the General Assembly passed an act which appears

State ex rel. Wilder et als., vs. Board of Liquidation.

in the published acts of that session *under the number* 110, but is referred to in the amendment to the Constitution of 1879, adopted in 1892, as Act No. 36.

This act, though it preceded the adoption of the amendment, was entitled "An Act to carry into effect the Constitutional Amendment passed at the present session of the Legislature relative to the bond debt of the city of New Orleans, and to authorize and direct the said city to issue through the board of liquidation of the city debt four per cent. bonds, to be known as the constitutional bonds of the city of New Orleans, payable fifty years from date; and to direct the retirement of *the now outstanding bonded debt* of said city, premium bonds excepted, by the sale of said constitutional bonds and application of proceeds by the board of liquidation to the payment of said outstanding bonds, premium bonds excepted, and to the payment also of certain judgments against the city on floating debt claims created prior to 1879, and to authorize the purchase by said board of said outstanding bonds other than premium bonds, or the exchange thereof for said constitutional bonds and for the payment of said outstanding bonds and of the aforesaid outstanding bonds not retired under this act and for the payment of the annual allotment of premium bonds and premiums; to direct the levy and collection by the city of one per cent. now levied for the bond debt and to direct the payment to and application by the board of liquidation of said taxes to the purpose aforesaid for which it is levied, and to provide a sinking fund for said constitutional city bonds and for the disposition of the surplus of said tax not required for the aforesaid bond debt and to recognize said tax as the contract right of the holders of the aforesaid bonds and to recognize also the exemption of said constitutional bonds from all taxation, and to define the functions and powers of said board of liquidation."

· The first section of that act declares that in order to provide for the retirement of the outstanding bonded indebtedness of the city of New Orleans and such other indebtedness as under existing laws is or becomes entitled to be funded into any series of bonds, always saving and excepting, however, the bonds known as premium bonds, the city of New Orleans be authorized, empowered and directed to issue bonds to the amount of ten millions of dollars, described as to their form and terms.

It directs that these bonds when executed should be delivered to the board of liquidation of the city debt to be used for the purposes aforesaid in accordance with the provisions of the act.

The second section authorized and empowered the board to sell and dispose of such amounts of said constitutional bonds as might be requisite for the purposes expressed in the later section of the act, and fixed the terms and conditions on which they should be sold.

The third section directed that all the funds received by the board from the sale of constitutional bonds should be immediately deposited with the fiscal agent of the city of New Orleans, to the credit of a special fund called the Bond Sales Fund, which said fund should be used solely and exclusively for the purpose of retiring by payment all the said now outstanding valid bonds of the city of New Orleans, matured or subject to be called upon, including the certificates or bonds issued under the fourth section of Act No. 54 of 1882, and including judgments then or thereafter rendered on floating debt claims prior to 1879, entitled to be funded under Act No. 67 of 1884, but excluding premium bonds issued under Act No. 31 of 1876 not to be retired under the act.

The fourth section gave the board power after the payment of all aforesaid outstanding bonds subject to call or matured as provided in the third section, to purchase the unmatured outstanding bonds of the city, premium bonds always excepted, and fixed the terms and conditions under which the purchase could be made.

The fifth section authorized the board to exchange bonds issued under the act for valid outstanding bonds of the city, premium bonds excepted, and fixed the manner, terms and conditions under which the exchange could be made.

The seventh section made it the duty of the council in order to provide for the payment of the principal and interest of the constitutional bonds authorized to be issued by the act and all other valid outstanding bonds of the city, to levy for the year 1892 and annually thereafter, until the principal and interest of the bonds authorized to be issued was fully paid, a special *ad valorem* tax of one *per cent.* upon all the taxable property of the city of New Orleans, said special tax to be a part of and not in addition to the tax of twenty mills and two-tenths of a mill on the dollar of value then levied for all purposes by the city of New Orleans.

The eighth section directed that out of the proceeds of said one *per cent. per annum* tax, beginning in the year 1892, the board of liquidation should annually provide for the carrying of the premium bond plan; the payment of the interest upon the bonds authorized to be issued by the act, and of the interest upon all other outstanding interest bearing bonds of the city, and after the year 1925 for the annual sinking fund necessary to call and retire the number of bonds provided for in section 9 of the act.

It further directed *that after making in each year the provisions* above required, and after deducting the expenses incurred by said board, and after paying *any deficiency in the interest* fund of *any previous years,* one-half of the surplus should be passed to the credit of a special fund to be known as the "Permanent Public Improvement Fund," to be disposed of as disposed of *later in the act;* and the other half of said surplus should be paid over to the school board of the city in addition to any other fund appropriated by said city out of other funds, to be used in the maintenance and support of the public schools in said city.

The tenth section directed that the "Permanent Public Improvement Fund" should be used exclusively for the purpose of the construction of permanent public improvements in the city, such as leyees, canals, drainage stations, pavements, public buildings, public parks, and bridges, and required that all ordinances passed by the common council to be paid out of this fund should be first approved by the said board of liquidation, who should not draw any check on said fund unless they should be convinced upon proper enquiry that said ordinance covered the construction of a permanent improvement within the purview of the act.   It was declared in the section that the true meaning of this clause was not to give said board any authority to say to what permanent public improvement any fund should be applied, but only to see that said funds should be applied exclusively to the construction of improvements that are permanent.

In the eleventh section of the act the board of liquidation was created a body corporate with power to sue and be sued; it was declared that nothing in the act should be construed to affect or change in any manner the duties, powers and functions of the board of liquidation under existing laws, not inconsistent with it, or the rights of said board to the assets and property of the city not dedicated to public use, including the uncollected taxes prior to 1879, but said duties,

functions, rights and powers were maintained and confirmed in full force.

The 16th section declared all the substantial provisions of the act to be a contract between the State of Louisiana, the city of New Orleans, the taxpayers of said city, and each and every holder of said constitutional bonds.

The 18th section declared that nothing in the act contained should be construed to affect or disturb in any manner the existing right to the tax now (then) levied for premium bonds, and for said outstanding bonds not retired, said tax being preserved in full force and the payment of the allotments of premium bonds and premiums extant in the hands of holders and of the interest and principal at maturity of all outstanding bonds that might not be retired under the act, should it continue as now (then) directed under existing laws; said tax of one *per cent.* being levied for premium bonds and outstanding bonds not retired, as well as for the aforesaid constitutional bonds substituted for the outstanding bonds paid, purchased or retired, by exchanges under the act.

The 19th section declared the general provisions of the act should not take effect until the adoption of the Constitutional amendment, then contemplated, and repealed all laws or parts of laws contrary to or inconsistent with the act.

The Constitutional amendment referred to was submitted to and adopted by the people and was as follows:

"For the purpose of retiring the now existing valid outstanding bonds of the city of New Orleans, including the bond certificates or bonds issued under the act, of the Legislature No. 58 of 1882, and to retire judgments now or hereafter rendered against the city on floating debt claims prior to 1879, entitled to be funded under Act 67 of 1884, the said city of New Orleans is hereby authorized and directed on and after the adoption of this amendment to issue through the board of liquidation of the city debt, bonds to be known as the constitutional bonds of the city of New Orleans, not exceeding ten millions of dollars, at fifty years, bearing four *per cent. per annum* interest, to bear date and be in the form prescribed by the legislature. The said bonds shall be applied by the said board to the retirement of said outstanding bonds and judgments by the sale of said constitutional bonds, and application of the proceeds of

sale by the board of liquidation to pay or purchase said outstanding bonds and judgments, or by exchanging the said constitutional bonds on the terms and in the mode prescribed by the legislature. For the payment of the interest and principal at maturity of said constitutional bonds and other outstanding bonds not retired under this amendment and for the payment of the annual allotments and premiums of the premium bonds of said city, the said city is hereby authorized and directed to levy annually and until the full payment of said bonds, a special tax of one *per cent.* on all the real and personal property of the city; said tax to be part of and not in addition to the tax of twenty mills and two-tenths of a mill on the dollar of the valuation now levied for all purposes by the city of New Orleans, and the said tax shall be paid over as collected to and be applied by the board of liquidation to the payment of the interest and principal at maturity of said constitutional bonds and outstanding bonds not retired and to the payment of the allotments of premium bonds and premiums extant in the hands of holders. Said tax is hereby declared to be the contract right of the holders of all said bonds; and the exemption of said constitutional bonds from all taxation by the city of New Orleans and State of Louisiana hereby recognized and declared, and *after the payment of all the interest on said constitutional bonds and bonds not retired, and the payment of the said annual allotments of premium bonds and premiums extant in the hands of holders and after making provisions for a sinking fund at such time and of such amount as the legislature prescribes, the surplus of said one per cent. shall be disposed of by the legislature.*

The act passed at the present session, No. 36, entitled "An Act to carry into effect the constitutional amendment passed at the present session relative to the bond debt of the city of New Orleans, etc., be and is hereby approved and confirmed in all its parts as a contract between the city of New Orleans and the holders of said constitutional bonds, premium bonds and of the bonds outstanding not retired as aforesaid.

The city of New Orleans is hereby authorized and empowered to examine into and assume the payment of the claims and obligations of the board of school directors for the city and parish of Orleans, due for the year 1880, 1881, 1882, 1883, and 1884, now in the hands

of original owners who have in no wise parted with their right of ownership or pledged the same, as may be found to be equitably due by said board fer services rendered, labor performed, or materials furnished by authority of said board."

In 1896, by Act No. 114, the General Assembly created a *drainage* commission for the city of New Orleans. It gave the commission full power to control and execute the drainage of the city, authorizing it to proceed to execute and carry out substantially the plan for such drainage adopted by the council of said city by ordinance 10,091, Council Series, approved 10 July, 1895, so far as it might find said plan desirable and practicable, with the right, however, to modify the same as in its judgment circumstances might require. All work done or supplies and materials ordered by the commission were directed to be let out to the lowest bidder. In order to raise funds for the purpose of doing the work speedily and on an extensive scale, the commission was given power to issue and dispose of its negotiable bonds bearing interest at a rate not exceeding five *per cent. per annum,* payable semi-annually, to be sold by the commission at not less than par.

That portion of the funds in the hands of the board of liquidation under the provisions of sections 6 and 10 of Act No. 110 of 1890, accruing to public works, etc., from January, 1898, was dedicated and applied for the purposes of the act, and all monies and funds at the time of the passage of the act under the control of the city of New Orleans, and afterwards to be received, arising from the sale of street railroad franchises, or other franchises, were also dedicated and applied to the purposes of the act.

All monies and funds dedicated and applied for the purposes of the act were declared to be consecrated to the payment of the principal and interest on said bonds. It was declared that all the provisions of the act respecting the dedication and application of funds and money, constituted a contract with the holder or holders of bonds issued, the obligation of which contract should not be impaired.

In 1898, by Act No. 63, the General Assembly amended and reenacted sections 6, 7 and 8 of Act 114 of 1896, creating the drainage commission. Under the amendment to section 6, the amount of bonds which the drainage commission had been authorized to issue

was reduced from five millions to one million five hundred thousand dollars. In the same amending section, it was declared that all monies and funds dedicated and applied by the act to the purposes thereof, were primarily consecrated to the payment of the interest on said bonds, and the redemption of the principal thereof, as provided in the act, but any surplus of said funds, inuring to said commission from taxes of 1899, 1900, 1901 and 1902, and from other sources prior to January 1, 1893, not required to pay current interest on said bonds, might be used for the general purposes of said commission.

The commission, after the year 1920, was given the right, and it was made its duty, to call in and pay, not exceeding two hundred thousand dollars of said bonds in each year, and in the order of their issue, beginning with number one.

By the seventh section of the act, its provisions respecting the dedication and application of funds and monies were declared to constitute a contract primarily with the holders of said bonds as aforesaid to the extent as aforesaid, and also with each and every person or corporation that may have entered into contracts with the said commission, and it was further declared that the obligation of said contract as to dedication and application of funds and monies should not be impaired and might be enforced by any holder of said bonds or by any contract creditor of said commission by *mandamus* and injunction, or by other proceedings in court.

In 1886 this court was called upon in Labat vs. New Orleans (38 Ann., 284), to pass upon the right of the plaintiff therein declaring on certificates issued by the board of directors of the public schools of the city of New Orleans during the years 1874, 1875 and 1876, to recover judgment thereon against the city of New Orleans, the ulterior object being to obtain therefor bonds of said city to be issued under the provisions of Act No. 67 of the Legislature of 1884, which was amendatory of Act No. 133 of 1880, passed for the purpose of liquidating the indebtedness of the city of New Orleans.

The court in its opinion stated that the main contention hinged upon the question as to whether such certificates evidenced or not an indebtedness of the city of New Orleans; that plaintiff's argument was that those certificates constituted a part of the indebtedness of the city of New Orleans, but that if when issued they were not debts

of the city they had acquired that character under a correct construction of Article 254 of the Constitution of 1879, and of section 3 of Act No. 74 of 1880, which purposed to enforce the provisions of Article 254 of the Constitution.

After an examination of the certificates, the court was of the opinion that they were not evidences of debt against the city, and their holders had no right to obtain judgment against the city with a view to having the same converted into bonds under the provisions of Act No. 67 of 1884; that that portion of Act No. 74 of 1880 which placed the unpaid salaries of school teachers subsequent to 1872 and prior to January 1st, 1880, on the same footing with the valid indebtedness of the city of New Orleans, and authorized bonds to be issued to take up school board certificates which had been issued for the same, was unconstitutional and therefore void.

Referring to plaintiff's argument that this act was authorized by Article 254 of the Constitution, reading, "that the General Assembly shall enact such laws as may be proper to liquidate the indebtedness of the city of New Orleans and apply its assets to the satisfaction thereof"; the court said: "It can scarcely be argued that by this language the convention could be construed to have meant that the *legislature* could provide for the *liquidation* of claims which were not part of the indebtedness of the city of New Orleans, or that such language could possibly be strained to mean that the legislature was therefore vested *with the power* to coerce the city of New Orleans into the settlement of school certificates which had issued without her authority or consent, by an irresponsible board or corporation, for or without valuable consideration, and perhaps in direct violation of the very law whence such board could derive its only legitimate authority.

The language of the Constitution can authorize no such deductions and its proper construction would at once strike with *nullity any attempt of the legislature to fasten on the city of New Orleans* the obligation to settle or liquidate any claims which are not legally and unequivocally included in the term 'indebtedness.' The very letter and the undoubted *spirit of the Constitution* are most obviously adverse to any such proposed legislation; they go to the extent of forbidding such action even with the consent of the corporation."

In 1888 the General Assembly, in Act No. 81 of that year, provided

that the city council of New Orleans in making their annual budget of expenditures should include therein the amount deemed necessary to meet the expenses of the schools and keep in good repair school houses and grounds, as may seem reasonable and just, provided it should not exceed the statement of the school board to be previously made, and shall not be less than two hundred and fifty thousand dollars, whereof $75,000 is to be paid out of the reserve fund of twenty *per cent.* contributed by section 66 of Act 20 of 1882, and Act 109 of 1886, from which certain claims against the board shall be gradually paid so as to be extinguished in 1896. The act authorized the board, if necessary, to enforce its provisions by *mandamus.*

The city having refused to make appropriations as directed, the board sought by judicial proceedings to force it to do so through *mandamus.* (State *ex rel.* School Board vs. City of New Orleans, 42 Ann., 94.)

The city defended upon the ground that the General Assembly was attempting to amend its charter in a prohibited manner, and requiring it to pay through the board of directors, a debt which it did not owe. The District Court refused the *mandamus* and the Supreme Court on appeal affirmed the judgment.

In the course of its opinion this court said: "It is elementary that a State, in the absence of constitutional prohibition, may delegate part of her political and administrative powers to municipal corporations within her borders, which then become State functionaries, and that whenever such delegation may take place, the State can confer on them certain rights, which she may subsequently extend, abridge or withdraw, as may seem just and advisable, but without impairing the obligation of contracts. This privilege of delegation is essential in the very nature of things, as otherwise the local administration necessary for public good would be an impossibility in consequence of the practical inability of the State general government to well provide by itself for the regulation of administrative matters on numerous important details in the different parts of the State.

"The organic law may, however, check the incidental rights of the legislature so that when constitutional restrictions have been imposed, the limitation is paramount and the legislature is impotent.

"Indeed, it is a question settled beyond the possibility of reasonable doubt, and which needs no reference to authorities to be verified, that the supremacy of the legislature over a municipal corporation in many respects, is restrainable by qualifications placed by the Constitution in terms, or by fair implication.

"It is as clear that a legislature can no more transgress a State Constitution than a convention can violate the Federal Constitution, a municipal corporation can override its charter or valid laws affecting it and the Federal or State Constitution.

"Although under an express constitutional provision the legislature has authority to cancel its charter and remit its inhabitants to another form of government (Article 254), that body has no right to *compel* its representatives by whatever name under its actual or under an eventual form of government, to do that which parochial or municipal corporations cannot be forced to do. So that if by the terms of the Constitution or fair implication from them, it appears that the legislature has no right to compel a municipal corporation to do that which the Constitution says the legislature may authorize them to do, and if the legislature undertakes to go beyond its power of authorization, its action is nugatory."

In State *ex rel.* Town of Mansfield vs. Police Jury of DeSoto Parish, 47 Ann., 1244, we had occasion to examine into this same question as to the power of control of the General Assembly over the powers of taxation, the actions and the funds of a municipal corporation, in view of constitutional restrictions and limitations, and reached the same conclusions which had been reached in 42 Ann., 94, by our predecessors.

Under the principles announced in the cases cited, the unpaid salaries of school teachers in the public schools of the city of New Orleans, for the years 1880, 1881, 1882, 1883 and 1884 were not "debts" of the city of New Orleans at their origin and could not be made so by mere legislative authority.

Their *status* in this respect remained unchanged up to the amendment to the Constitution of 1879, adopted by the people of the State, which authorized and empowered, but did not compel the city of New Orleans to examine into and assume the payment of the claims of teachers for these particular years.

The vote of the people of New Orleans on the adoption of that amendment was 34,366 votes for and 599 votes against the same.

The effect of the adoption of that amendment was not to constitute those claims *ipso facto* "debts" of the city. The city only became committed to payment of the same by its subsequent voluntary act.

The amendment designated no time nor method nor means for the payment of these claims, if and when assumed.

The indebtedness of the city covered by Act No. 110 of 1890, which the amendment "recognized and confirmed in all its parts", for the funding and payment of which the legislature was therein providing through bonds not to exceed ten millions in amount), was the then existing "valid outstanding bonds of the city of New Orleans, including the bond certificates or bonds issued under the Act No. 58 of 1882, and judgments then rendered or thereafter to be rendered against the city on floating debt claims prior to 1879 entitled to be funded under Act No. 67 of 1884." The funding or payment of the unpaid salaries for the years 1880, 1881, 1882, 1883 and 1884 of public school teachers, was evidently not contemplated by this act. The debts to be funded and for which provision for payment, through bonds, was therein made, were specifically enumerated, and the taxes authorized and directed to be levied by the act, were dedicated and devoted especially and primarily to the satisfaction of those particular debts as under a contract obligation. The surplus of the one *per cent.* tax referred to in the act was the surplus "after the payment of all the interest on said constitutional bonds and bonds not retired, and the payment of the annual allotments of the premium bonds, and premiums extant in the hands of holders, and after making provision for a sinking fund at such time and of such amount as the legislature prescribed. This surplus was authorized to be disposed of by the legislature.

The legislature disposed of it in the 8th section of Act No. 110 of 1890.

After declaring in what way the one *per cent.* tax should each year be primarily disposed of, the General Assembly used the following language: "After making in each year the provision above required, and after deducting the expenses incurred by said board, and after paying any deficiencies in the interest fund of any previous years, one-half of the surplus should be passed to the credit of a special fund, to be disposed of as disposed of later in the act, and the other half of said surplus should be paid over to the school board of the

city in addition to any other funds appropriated by said city out of other funds to be used in the maintenance and support of the public schools in said city."

The disposition of the permanent improvement fund which the 8th section declared was to be made "later in the act," was made in its 10th section.

The General Assembly had, as we have seen by its Act 114 of 1896, given special direction as to the permanent improvement fund, ordering it to be used for city drainage. It had organized a drainage commission to take charge of that subject and for the purpose of raising funds for the purpose of doing the work speedily and on an extensive scale, had given power to the commission to issue and dispose of its negotiable notes to an amount of five millions of dollars, and that portion of the funds in the hands of the board of liquidation accruing to public works under sections 6 and 10 of Act 110 of 1890, had been by it dedicated and appropriated as under a contract obligation for the payment of these bonds.

The drainage commission duly organized, and at the time of the adoption of the Constitution, it had created obligations to a large amount, payable out of the surplus.

We do not understand it to be claimed that the holders of claims for unpaid salaries for the years 1880, 1881, 1882, 1883 and 1884 of teachers in the public schools of New Orleans, were entitled to have their claims funded or paid under the Act of 1890; but that their pretensions rest exclusively upon the effective force of Articles 315, 316 and 317 of the Constitution of 1898—which effective force the defendants question.

In discussing this matter we have to deal not with the powers of the legislature, but of those of a convention, not only over corporations and corporate acts, but over the legislature and legislative acts.

In State ex rel. Folsom vs. Mayor, etc. (32 Ann., 714), this court said: "A Constitution framed by a convention of the people, especially after having been submitted to and ratified by a vote of the people, is the ultimate expression of the will of the sovereignty itself. Its provisions may control with plenary power all private and social rights and all existing laws and institutions, and may even violate the most fundamental rules of justice, *provided only they do not conflict*

*with the provisions of the Constitution of the United States,* which with regard to the subjects controlled by them and to those alone form the paramount law of the land.   No court has the right to question the validity of any provision of a State Constitution, however unwise, impolitic or unjust it may be upon any other ground whatever than that it violates the Constitution of the United States." (Cooley on Constitutional Limitations, page 34.)

"It follows, therefore, that the provision of the Constitution of 1879 must have full force against all persons and against all rights except so far as its operation is restrained by the Constitution of the United States.

The court said "it was useless to discuss limitations upon the powers of the legislature imposed by the Constitution of 1868 because those limitations had no force over the power of the convention."

This last statement was made, of course, with reference to matters not controlled by the provisions of the Constitution of the United States.

The application of these principles to the matters presented to us in this case confine our enquiries to a very narrow range.   Are the provisions of Articles 315, 316 and 317 of the Constitution violative of any of the provisions of the Constitution of the United States?

It is claimed they violate the obligations of contracts and therefore should not be enforced.

The first point to which we direct our attention is as to the power and extent of the power of the convention over the subject of the drainage of the city of New Orleans, or of matters falling under the term "permanent public improvement."   Was there anything in the situation of affairs when the convention met which had conferred upon New Orleans, as a city, an absolute vested right to determine for itself for the future, free from all legislative or constitutional control, the extent to which permanent improvements should be made within its limits—the selection of the objects of permanent improvement, or the amounts to be expended for that purpose?   Unquestionably not.

The convention would have had the right to have ordered the city as such to have desisted from improvements of a particular kind, either permanently or for a limited time, with the privilege of continuing later on, or to alter the character or kind of improvements, or the amount which should be expended for the same.   The corpor-

ation would in vain urge that the course pursued was detrimental to its interests; that it would be checked in its progress; that the public health would be impaired; it would be forced to yield to a superior power legally controlling these matters, however disadvantageously the power might be exercised. Neither the city nor the drainage commission could legally object that the extent or scope of the system of permanent improvement would be restricted by the withdrawal of funds needed to make that system complete or successful.

The work could have been stopped at any time, though the rights of contract creditors as they existed at the date of the action of the convention could not have been by it impaired.

Our examination on this branch of the case as to the effect of enforcing Articles 315, 316 and 317 of the Constitution will go no further than to see whether contract creditors having rights upon the permanent improvement fund would be impaired or not.   Defendants assume that the mere fact that constitutional bonds should be sold for the purpose of paying the certificates held by relators or should be given in exchange for those certificates, would of necessity entitle the holders of such bonds to prime the holders of permanent improvement bonds, bonds drawn against the "surplus" of the one per cent. tax dedicated to permanent public improvements, and also to necessarily come in on a footing of equality with all the other holders of consolidated bonds, and they maintain if this be true the rights of contract creditors under the funding act, would be impaired.

Relators on the other hand insist that the only portion of the one per cent. tax ever set aside for permanent public improvements was one-half of the surplus produced by the tax which would remain after having retained in the hands of the board of liquidation enough to meet the payment in full of a ten million issue of, consolidated bonds, and that therefore it would be legally immaterial to creditors basing contracts on such surplus, to whom the other portion of the fund would go; it would be enough for them to know it would not go to them, and relators urge that other holders of consolidated bonds would have no ground of complaint; that they should be permitted to share equally with them from the tax fund, as they had accepted their bonds on the expected basis of coming in concurrence with an issue of ten millions of bonds; that they might be interested that the limit as to the amount of the bonds should not be passed, but that

they were without legal interest, when the limit should not have been passed, as to who should be the holders of the bonds sharing the fund with them.

In support of this last position they rely upon the decision of the Supreme Court of the United States in Board of Liquidation vs. Mc-Comb, (92 U. S. Reports, 531). If the collection of the one *per cent.* tax would suffice to pay each year the holders of consolidated bonds issued in taking up or retiring the bonds and claims such as were provided for by the Act No. 110 of 1890, and the Constitutional Amendment of 1892, without any conflict with the bonds, ordered to be sold by Article 317 of the Constitution of 1898, the former, of course, would have no cause of complaint, but if from any cause the amount of the tax collected would be insufficient for that purpose, we do not think the holders of these latter bonds could force the former to *pro rate* with them the amount in hand.

This condition of things is not existing. It may never arise, and should it arise, the board of liquidation would doubtless have taken steps to distinguish bonds issued under Article 317 from those which had been otherwise issued.

It does not necessarily follow that all claims payable out of a particular tax should stand on a footing of perfect equality as to payment. If from any legal existing cause there would be priority of right, there would be priority of payment. We have an example of this in the matter of the priority or preference payment of the salaries of the constitutional officers of the State over warrants for ordinary claims, though all are payable out of the general fund (State *ex rel.* Collins vs. Burke, Treasurer, 32 Ann., 1213), and it has been held that amounts needed for the alimony of the city have to be paid out before those for other purposes are paid. (Lucas E. Moore vs. City of New Orleans, 32 Ann., 729; Saley vs. City, 33 Ann.; 79; Shotwell vs. City, 36 Ann., 936; Wadsworth vs. City, 45 Ann., 889). So also it sometimes happens from special circumstances that the holder of one or more of the same series of notes may hold rights subordinated to those of the holders of the others.

If there should be, in the future, any actual conflict of interests, the board of liquidation and the parties interested will doubtless have taken steps to be able to protect themselves.

We do not take the same view that relators do as to what was meant and intended to be conveyed by the "surplus" referred to

by Act 110 of 1890, Act No. 114 of 1896, and the constitutional amendment of 1892. We think the law makers intended that any portion of the one *per cent.* tax provided for in Act 110 not needed for the payment or retirement of the particular bonds or claims therein specially provided for as to payment or retirement, should constitute the surplus of the tax. That it was not contemplated when these laws were passed, or the amendment of 1892 adopted, that in order to exhaust any portion of the ten millions of dollars originally expected to be needed to pay the existing bonds and the existing claims therein specially enumerated, which might not be necessary for the purpose, new classes of claims should or would be thrown under the provisions of the original funding law.

We think the "surplus" was intended to connect at once and follow immediately behind as to its appropriation the amount, beyond that actually needed to carry out the plan as originally mapped out and planned. The surplus was provisionally ascertained each year in a manner particularly specified to be readjusted the next in a manner also particularly specified. All the surroundings and circumstances connected with the legislation negative the idea that the surplus mentioned was to be only any surplus over ten · millions of dollars which might result from the collection of the one *per cent.* tax.

We think the board of liquidation, the drainage commissioners, and those with whom they contracted were justified in placing that interpretation upon the legislation. and that contract rights based upon the same should be protected from impairment. The convention, while ordering the payment of the certificates held by the relators, through sales of consolidated bonds, could not confer upon the holders of such bonds rights which in any way would come in competition with the contract rights of creditors existing against the tax at the time of the adoption of the Constitution. Though there was no mention in the Constitution as to the rank of the bonds which would be issued to take up relators' certificates. that rank resulted from legally existing conditions which could not be constitutionally interfered with. There is no constitutional objection to the convention's ordering the board of liquidation to sell bonds to take up the relators' certificates, but there would be constitutional objection to be urged, if the effect of the issuing of such bonds would be to place the holders thereof on an equality with the holders of bonds issued to take up the bonds and claims provided for as to their fund-

ing and payment by Act No. 110 of 1890, Act No. 114 of 1896, and the constitutional amendment of 1892.   Duperier vs. Police Jury, 31 Ann., 710; Shields vs. Pipes, 31 Ann., 765.

The consolidated bonds which relators seek to have issued upon their prayer will really be drawn against (when issued) any surplus which will remain of the one *per cent.* tax after the payment of all the bonds issued and to be issued by the board of liquidation, under Act No. 110 of 1890, and the constitutional amendment of 1892, in order to fund and retire and pay the bonds and debts therein specially enumerated, and also the bonds issued and to be issued by the drainage commission under the provisions and authority of Act No. 114 of 1896, to pay the contracts existing at the date of the adoption of the Constitution, which were entered into upon the faith of the surplus directed to be set aside to the credit of the permanent improvement fund by the Act No. 110 of 1890, Act No. 114 of 1896, and the constitutional amendment of 1892.

The effect of this will be to subordinate the rights of holders of bonds issued by the drainage commission to pay for contracts entered into after the adoption of the Constitution of 1898 to those of the holders of consolidated bonds to be issued under the orders of Article 317 of the Constitution of 1898.   This may check and impede the work of public improvement, but it is a matter which we cannot control.

For the reasons assigned, it is hereby ordered, adjudged and decreed that the judgment of the District Court be and the same is hereby affirmed, except as to the interest allowed, which interest is hereby reduced from five to four *per cent.*   Costs of appeal to be borne by appellees.

Mr. JUSTICE MONROE takes no part, as he was not a member of the court when the case was submitted.

• 

## ON APPLICATION FOR REHEARING.

An examination of this cause on the application for a rehearing, has brought to our notice, that in affirming the judgment of the District Court, we affirmed that portion of the same which dismissed the intervention of the drainage commission of New Orleans, as being without any interest in the cause.   Such was not our intention.

We think the drainage commission of New Orleans had sufficient

118

interest in the matters involved in the litigation to intervene in the cause.

A re-examination of the cause has brought us to the conviction, that our judgment is erroneous, in so far as it accorded interest to the relators, upon their certificates.

For the reasons assigned, it is ordered, adjudged and decreed that our former judgment be amended, by setting aside that portion of the same by which interest at four *per cent.* is accorded to the relators, and by which the judgment of the District Court is affirmed, in dismissing the intervention of the drainage commission.

It is now ordered, adjudged and decreed, that the judgment of the District Court, in so far as it dismisses the intervention of the drainage commission of New Orleans as having no interest in the cause, and in so far as it recognizes the right of the relators to interest upon their certificates, be annulled, avoided and reversed, and it is now ordered, adjudged and decreed, that recognizing the right of the said drainage commission to intervene herein, its intervention be, and it is hereby reinstated; and it is further ordered and decreed, that that portion of relators' present demand, by which they pray that they be recognized as entitled, and accorded interest upon their certificates, be and the same is hereby rejected.

It is further ordered, adjudged and decreed, that the judgment of the District Court, except as herein altered and amended, be affirmed, and our own judgment, except in so far as herein altered and amended, remain undisturbed.

Rehearing refused.